1  FRANK M. PITRE (#100077)
   fpitre@cpmlegal.com
2  LAURA SCHLICHTMANN (#169699)
   lschlichtmann@cpmlegal.com
3  ARA JABAGCHOURIAN (#205777)
   ajabagchourian@cpmlegal.com
4  **COTCHETT, PITRE & McCARTHY**
   San Francisco Airport Office Center
5  840 Malcolm Road, Suite 200
   Burlingame, CA  94010
6  Telephone:  (650) 697-6000
   Facsimile:  (650) 692-0577
7
   GEORGE COREY (#34580)
8  grc@coreylaw.com
   DARIO de GHETALDI (#126782)
9  deg@coreylaw.com
   **COREY, LUZAICH, PLISKA,**
10    **de GHETALDI & NASTARI, LLP**
   700 El Camino Real, P.O. Box 669
11 Millbrae, CA  94030
   Telephone (650) 871-5666
12
   Attorneys for Plaintiff and the Class

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CLAIRE C. HAGGARTY**, individually and on behalf of all others similarly situated, | Case No. CV-08-01609 JSW |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)** |
| vs. | Date: September 26, 2008<br>Time: 9:00 a.m.<br>Ctrm: 2, 17th Floor |
| **STRYKER ORTHOPAEDICS (aka STRYKER ORTHOPEDICS; aka STRYKER ORTHOPEDICS, INC.); HOWMEDICA OSTEONICS CORPORATION**; **STRYKER CORPORATION**; and **STRYKER SALES CORPORATION**, | Honorable Jeffrey S. White |
| Defendants. | |

# TABLE OF CONTENTS

Page

I. INTRODUCTION. .................................................................. 1

II. FACTUAL ALLEGATIONS. ..................................................... 2

    A. Stryker Is One of the Five Largest Manufacturers that Dominate the Market for Hip and Knee Implant Products. ......................... 2

    B. A Federal Investigation Found that Stryker Had Paid Many Millions of Dollars in Disguised Kickbacks to Orthopedic Surgeons to Artificially Inflate the Sales of Its Hip and Knee Implant Products. ....... 2

    C. Stryker's Pervasive Kickback Schemes Artificially Increased the Prices as Well as Sales Volume of Its Hip and Knee Implant Products. ........................................................................ 4

    D. The Stryker Kickback Schemes Raised Costs Not Only for Public Health Care Programs, But Also for Private Sector Patients, Including Plaintiff. ................................................................ 4

III. STANDARD OF REVIEW. ..................................................... 5

IV. LEGAL ARGUMENT. ........................................................... 6

    A. Stryker's Arguments for Dismissing the Cartwright Act Claim Rely on a Startling Misreading of the Complaint. ........................... 6

        1. Stryker's Contention that Plaintiff Bases the Cartwright Act Claim on Mere Allegations of Cooperation Among Stryker Corporate Affiliates Is False. ................................................ 6

        2. The Cartwright Act Claim Is Not Based on a Theory of Horizontal Conspiracy Between Stryker and the Other Hip/Knee Implant Manufacturers; Instead, the Complaint Alleges Stryker's Vertical Conspiracies with Surgeons. ............ 7

    B. Stryker's Argument that the Section 17200 Claim Should Be Dismissed on Grounds of Failure to Allege (1) Injury in Fact or Causation and (2) Entitlement to Restitution or Injunctive Relief Again Improperly Disregards Allegations in the Complaint. ............. 8

        1. The Complaint Alleges that Plaintiff Sustained Financial Harm Due to Stryker's Misconduct. ......................... 8

        2. The Complaint Alleges Facts Stating Plaintiff's Eligibility for Restitution from Stryker. ................................. 9

        3. The Complaint Sufficiently Alleges Facts that Would Warrant Injunctive Relief Benefiting Private-Pay Patients, Particularly After the Expiration of Stryker's Non Prosecution Agreement in April 2009. .............................................. 10

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT**, Case No. CV-08-01609 JSW                                            i

    C.    The Complaint Sufficiently Alleges Plaintiff's Membership in the Class.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.    CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT**, Case No. CV-08-01609 JSW    ii

# TABLE OF AUTHORITIES

**Page**

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 11

*Barnett v. Centoni*,
    31 F.3d 813 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Albright v. Oliver*,
    510 U.S. 266 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Bell Atlantic Corp v. Twombly*,
    127 S. Ct. 1955 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Branch v. Tunnell*,
    14 F.3d 449 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Columbia Natural Res., Inc. v. Tatum*,
    58 F.3d 1101 (6th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

*Hospital Bldg. Co. v. Rex Hospital Trustees*,
    425 U.S. 738 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Stac Elec. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Jenkins v. McKeithen*,
    395 U.S. 411 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12

*McCartin v. Norton*,
    674 F.2d 1317 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 11-12

**STATUTES AND RULES**

Fed. R. Civ. P. 12(b)(6) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cal. Bus. & Prof. Code

    § 16700 *et seq.* ("Cartwright Act") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    § 17200 *et seq.* ("unfair competition law") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT**, Case No. CV-08-01609 JSW                           iii

## I. **INTRODUCTION**

The Stryker Defendants' motion to dismiss Plaintiff's complaint argues (1) that no antitrust claim lies where a plaintiff alleges that a defendant conspired with its affiliates; (2) that the complaint fails to allege a cognizable claim of horizontal antitrust conspiracy; (3) that Plaintiff fails to allege that she has sustained harm due to Defendants' conduct; and (4) that the allegations regarding Plaintiff's membership in the class that she seeks to represent are deficient. None of these argument has merit.

Defendants have drastically mischaracterized the theory of Plaintiff's complaint, and ignored its allegations. The complaint alleges vertical, not horizontal, anticompetitive conspiracy. Supported by extensive allegations based on the recent federal investigation of Defendants' conduct, and on congressional testimony and other information about the effects of that conduct – all of which Defendants ignore – the complaint alleges that Defendants' covert kickback agreements with orthopedic surgeons have artificially inflated demand and prices for Stryker's hip and knee implant products.

Further, the complaint alleges that the effects of the kickback schemes include artificially inflating costs to patients in the private sector who have Stryker products implanted during hip or knee surgery, both directly and by driving up health insurance premiums. The complaint also alleges that Plaintiff Haggarty had hip replacement surgery in January 2006, in which one or more Stryker products were implanted or used, and that she paid several thousand dollars in out-of-pocket expenses for the surgery. While the complaint does not allege the precise portion of Plaintiff's out-of-pocket expenditures, nor of her health insurance premiums during the class period, that are attributable to the Stryker defendants' misconduct, such precision is not required at the pleading stage. Read properly – as a whole, and not as isolated parts, and drawing reasonable inferences in Plaintiff's favor – the complaint sufficiently alleges that Plaintiff sustained financial harm due to the Stryker defendants' unlawful business practices.

Similarly, the complaint sufficiently alleges Plaintiff's class membership. Should the Court find otherwise, however, Plaintiff requests leave to amend her complaint.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT, Case No. CV-08-01609 JSW                    1

## II. FACTUAL ALLEGATIONS

Defendants Stryker Orthopaedics, Howmedica Osteonics Corporation, Stryker Corporation, and Stryker Sales Corporation (hereinafter collectively referred to as "Defendants" or "Stryker") have moved to dismiss the complaint of Plaintiff Claire C. Haggarty ("Plaintiff") pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure. Since Defendants' Memorandum of Points and Authorities ("Def. MP&A") ignores most of the factual allegations of Plaintiff's complaint, allegations relevant to Defendants' motion are highlighted below.[1]

### A. Stryker Is One of the Five Largest Manufacturers that Dominate the Market for Hip and Knee Implant Products

As alleged in the complaint, the market for hip and knee implant products is "huge, highly lucrative, and tightly concentrated." (Complaint, ¶ 16.)[2] In the United States, more than 700,000 hip and knee replacement surgeries are performed every year, and U.S. sales of orthopedic devices for hips and knees exceeded $5.1 billion in 2005 alone. (*Id.*)

Five companies, including Stryker, together control almost 95% of the market for hip and knee implants. (¶ 17.) Stryker alone accounts for approximately 20% of the market. (*Id.*) For 2007, Stryker reported gross worldwide profits of $4.135 billion on $6 billion in net sales, with orthopedic implants accounting for 60% of that sales figure. (¶ 18.)

### B. A Federal Investigation Found that Stryker Had Paid Many Millions of Dollars in Disguised Kickbacks to Orthopedic Surgeons to Artificially Inflate the Sales of Its Hip and Knee Implant Products

In September 2007, the U.S. Department of Justice and the federal Department of Health and Human Services ("HHS") announced that a federal investigation had

---

[1] In considering a motion to dismiss pursuant to rule 12(b)(6), courts are required to accept well-pleaded allegations in the complaint as true. *Albright v. Oliver*, 510 U.S. 266, 268 (1994).

[2] In the remainder of this Opposition, the symbol "¶" refers to numbered paragraphs in Plaintiff's complaint.

confirmed that Stryker and the other four largest hip and knee implant manufacturers had engaged in a "massive pattern of 'financial inducements paid to surgeons to use their products' in hip and knee implant surgeries, in violation of several federal anti-kickback and false claim statutes." (¶ 20.) The federal government entered into settlements of criminal complaints and civil claims against four of the five companies, in exchange for settlement payments totaling $310 million and commitments to various reforms. (¶¶ 20, 24, 25.) However, because Stryker was the first of the big five hip/knee implant companies to cooperate with federal investigators, the federal government entered into a Non Prosecution Agreement with Stryker that held all federal claims against it in abeyance. (¶ 20 and Exhibit A to the complaint.)[3]

As detailed at pages 5-7 of the complaint – quoting congressional testimony about the investigation delivered by HHS's Assistant Inspector General for Legal Affairs, Gregory E. Demske – the kickback schemes took the form of consulting and product development agreements between Stryker (as well as the other four top manufacturers) and surgeons that actually "'involved minimal or no work being performed'" by the physicians. (¶ 21.) The federal investigation concluded that in these arrangements, Stryker, like the other four companies, "'derived little value beyond the acquisition of increased sales of artificial hip and knee implants.'" (*Id.*) There were many thousands of these "consulting agreements," and company payments ran into hundreds of millions of dollars from 2002 through 2006. (*Id.*) Stryker has recently published disclosures on its website acknowledging its millions of dollars to orthopedic surgeons throughout the United States, including California, during 2007 alone. (¶ 25.)

What Stryker, like the other companies, did receive in the way of benefits from the financial arrangements with surgeons was "pumped-up sales of their products." (¶ 22.) (See also ¶ 1: "a pervasive kickback scheme orchestrated by" Stryker used "phony

---

[3]  For purposes of this motion, the Court may consider Exhibit A to the complaint, as a document whose contents are alleged in and attached to the complaint, and whose authenticity is not in question. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT**, Case No. CV-08-01609 JSW                           3

consulting agreements with orthopedic surgeons to cleverly mask disguised kickbacks paid to doctors and/or hospitals in return for choosing which manufacturer's device to use during a patient's surgery," with the aim of increasing Stryker's market share.)   HHS official Demske's congressional testimony, along with scholarly research he cited in his testimony, indicate that the kickback agreements "were effective in producing the unlawful result that the participating company desired" – i.e., artificially elevated sales.  (¶ 23.)

### C. Stryker's Pervasive Kickback Schemes Artificially Increased the Prices as Well as Sales Volume of Its Hip and Knee Implant Products

Stryker's unlawful kickback schemes with cooperating surgeons were effective in promoting demand for its hip and knee implant products, sustaining its dominance in the hip and knee implant market.  (¶¶ 22, 23, 26.)  In turn, Stryker's artificially enhanced sales and market dominance have "inflate[d] the prices of the hip and knee implant products" that it sells.  (¶ 26.)  (See also ¶ 45: the unlawful agreements between Stryker and surgeons "result[ed] in artificially high prices for Stryker hip and knee . . . implant devices and related products.")

### D. The Stryker Kickback Schemes Raised Costs Not Only for Public Health Care Programs, But Also for Private Sector Patients, Including Plaintiff

The federal investigation and response were spurred by well-founded concern that inflated pricing of the hip and knee implant products sold by Stryker (as well as the other big four companies), attributable to the artificially inflated demand created by its kickback schemes with thousands of surgeons, was draining publicly funded health care programs like Medicare and Medicaid.  (¶ 27.)  However, the anticompetitive pricing effect of Stryker's kickback agreements is not limited to the public sector:  as the complaint alleges, "private-pay patients are also harmed by Stryker's practices."  (*Id.*)

The complaint identifies two ways in which private-sector patients – including both uninsured persons and persons whose health insurance includes a co-pay requirement – "are harmed financially" by Stryker's kickback schemes.  (¶ 28.)  First, the

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT, Case No. CV-08-01609 JSW                    4

co-pays or other out-of-pocket expenses of private-pay patients implanted with Stryker hip or knee products are artificially elevated. (*Id.*) Second, the premiums of patients with private health insurance are pushed higher over time due to the artificially increased costs. (*Id.*)

The settlement reached between federal officials and Stryker do nothing to remedy these financial harms to private-sector patients. (*Id.*) Moreover, Stryker's Non Prosecution Agreement is limited by its terms to 18 months from its execution (September 2007). (Exh. A to complaint, at 1.) Thus, the agreement will expire a mere six months after the September 2008 hearing on Stryker's motion to dismiss.

As a result, as the complaint alleges, the Non Prosecution Agreement provides no prospect of recovering restitution for private-pay patients in California of amounts that Stryker's kickback schemes have caused them to pay during the class period (¶ 29), as well as no assurance that any reforms will persist past April 2009.

One of the patients whose interests are not served by the Stryker Non Prosecution Agreement is Plaintiff, a resident of San Mateo County. (¶¶ 7, 30.) She underwent hip replacement surgery in January 2006, during which she was implanted with one or more Stryker products. (¶ 30.) Her out-of-pocket expenditures for her hip surgery amounted to approximately $3,600 or more. (*Id.*)

### III. STANDARD OF REVIEW

In considering a motion to dismiss, the court accepts as true the material facts alleged in the complaint, and construes the pleading in the light most favorable to the party opposing the motion, granting reasonable inferences and resolving all ambiguities in the pleader's favor. *Hospital Bldg. Co. v. Rex Hospital Trustees*, 425 U.S. 738, 740 (1976); *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994); *see also, e.g.*, *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996). At this stage in the litigation, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005), quoting

1  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (brackets in *Jackson*).

2  In conducting its analysis of a motion to dismiss, the court must consider the complaint in its entirety, not examine isolated parts in piecemeal fashion. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 52 (1st Cir. 2008).

## IV. LEGAL ARGUMENT

### A. Stryker's Arguments for Dismissing the Cartwright Act Claim Rely on a Startling Misreading of the Complaint

Stryker's motion to dismiss the Cartwright Act claim (Cal. Bus. & Prof. Code §§ 16700 *et seq.*, California's antitrust statute) drastically mischaracterizes the complaint, and fails to provide any valid reason for dismissing the claim.

#### 1. Stryker's Contention that Plaintiff Bases the Cartwright Act Claim on Mere Allegations of Cooperation Among Stryker Corporate Affiliates Is False

First, Stryker invokes a lengthy string of authorities for the proposition that no claim of violation of the Cartwright Act can be predicated on allegations of conspiracy between an entity and its corporate affiliates, and asserts that "the only concerted action alleged is 'cooperation' *among the Stryker defendants themselves*." (Def. MP&A at 5:3-10, 6:24-8:2 (italics in original).)

As highlighted in section II, however, this summary of the complaint's allegations is woefully inaccurate. The complaint alleges that Stryker entered into thousands of disguised kickback agreements, worth many millions of dollars, with orthopedic surgeons around California and the United States for the purpose of artificially inflating demand for Stryker's hip and knee implant products. (Complaint, ¶¶ 1, 20-26.)

The fact that the complaint does not name Plaintiff's surgeon is not "significant," as Stryker contends. (See Def. MP&A at 3:14-15.) It is not necessary for Plaintiff's surgeon to have participated in an illegal kickback agreement with Stryker. The complaint alleges that because many surgeons did participate in such illegal agreements, market-wide demand for and pricing of Stryker's hip and knee implants were artificially

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT**, Case No. CV-08-01609 JSW                                      6

elevated. (Complaint, ¶¶ 21-26.)

Similarly, Defendants' insinuation that the Cartwright Act claim against Stryker fails because the complaint does not name any of the surgeons and institutions that received improper kickback payments from Stryker is without merit, and Defendants' contention that "the complaint conspicuously fails to allege . . . facts suggesting any agreement, collusion, or concerted actions among the alleged co-conspirators and Stryker" is palpably false. (See Def. MP&A at 6:21-23.) The complaint quotes at length from congressional testimony by HHS Assistant Inspector General Demske describing features of the illicit agreements between Stryker (as well as the other four manufacturers) and the participating surgeons and institutions. (Complaint, ¶ 21, at pp. 5-7 of the complaint. See also ¶ 25, alleging Stryker's website disclosures of its payments of millions of dollars to orthopedic surgeons around the United States, including California, during 2007 alone.) The complaint also alleges Stryker's purpose in entering into such covert agreements and the effectiveness of the agreements in driving up demand and pricing for Stryker's hip and knee implant prices. (¶¶ 1, 22-24, 26-28.)

Thus, Stryker's first line of attack on the Cartwright Act claim falls far wide of the mark, and provides no support for dismissal of the claim.

**2. The Cartwright Act Claim Is Not Based on a Theory of Horizontal Conspiracy Between Stryker and the Other Hip/Knee Implant Manufacturers; Instead, the Complaint Alleges Stryker's Vertical Conspiracies with Surgeons**

Stryker's *Twombly*-based[4] argument that the complaint fails to plead the existence of horizontal conspiracy, "suggest[ing], at most, 'conscious parallelism' among competitors," is another red herring. (See Def. MP&A at 5:13-6:15, 8:3-12.)

It is, or should be, unmistakable from a reading of the complaint's factual allegations that the theory underlying Plaintiff's Cartwright Act claim is vertical conspiracy, not horizontal conspiracy. The complaint alleges multiple vertical

---

[4] *Bell Atlantic Corp v. Twombly*, 127 S. Ct. 1955 (2007).

conspiracies, all involving Stryker on one side: the numerous disguised kickback agreements between Stryker and the surgeons and institutions that facilitated Stryker's effort to sustain its market dominance and drive up demand for and pricing of its hip and knee implant products. (See Complaint, ¶¶ 1, 16-17, 20-23, 25-26.)

Thus, once again, none of the authorities that Stryker cites are applicable to the complaint in this case. Accordingly, Stryker's motion to dismiss Plaintiff's Cartwright Act claim should be denied.

### B. Stryker's Argument that the Section 17200 Claim Should Be Dismissed on Grounds of Failure to Allege (1) Injury in Fact or Causation and (2) Entitlement to Restitution or Injunctive Relief Again Improperly Disregards Allegations in the Complaint

In its attack on Plaintiff's claim under California's unfair competition law, section 17200 of the Business and Professions Code ("section 17200"), Stryker again resorts to ignoring inconvenient allegations in the complaint. This is improper, and Stryker's motion for dismissal of this claim should be denied.

#### 1. The Complaint Alleges that Plaintiff Sustained Financial Harm Due to Stryker's Misconduct

Stryker's argument that the complaint fails to allege both that she suffered financial harm and that such harm was attributable to wrongful business practices by Stryker acknowledges only a single paragraph of the complaint: paragraph 30, which contains allegations about Plaintiff's hip replacement surgery and her out-of-pocket expenses for the surgery. (See Def. MP&A at 9:9-13.) Stryker contends that the complaint fails to allege that any of Plaintiff's out-of-pocket payments went specifically toward the Stryker products, that Stryker benefited in any respect, or that any portion of Plaintiff's expenditures "resulted from wrongdoing by *anyone*, much less by Stryker." (*Id.* at 9:13-19.)

Transparently, Stryker's argument violates the firmly established principle that a complaint must be considered in its entirety when considering a Rule 12(b)(6) motion. *See Tellabs, supra*, 127 S. Ct. at 2510; *ACA Fin. Guar. Corp., supra*, 512 F.3d at 52.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT**, Case No. CV-08-01609 JSW       8

As summarized in section II, above, the complaint alleges that Stryker violated "several federal anti-kickback and false claim statutes," along with California's Cartwright Act and numerous other California and federal statutes, by entering into millions of dollars worth of unlawful kickback schemes with cooperating surgeons and institutions. (Complaint, ¶¶ 1, 20-23, 25, 54.) The complaint alleges further that these practices artificially inflated the prices of Stryker's hip and knee implant products. (¶¶ 22-23, 26-27.) It alleges that private-pay patients as well as the big public health care programs like Medicare and Medicaid have sustained higher costs in hip or knee replacement surgery as a result of ("attributable to") Stryker's illicit kickback schemes, and that private-pay patients also have experienced rising health care premiums due to the artificial and unlawful price-boosting by Stryker. (¶¶ 27-28.) It alleges that Plaintiff, who underwent hip replacement surgery involving one or more Stryker implant products, is one of the adversely affected private-pay patients. (¶ 30.)

Clearly, the complaint alleges that Stryker benefited financially from the same misconduct that harmed Plaintiff financially, by boosting its market share, pricing, and sales. (¶¶ 1, 21-23, 26.) The fact that the complaint does not specifically identify which portion of Plaintiff's out-of-pocket payments went directly for Stryker products does not support Stryker's motion. The complaint alleges that private-pay patients like Plaintiff either pay a portion of the <u>overall</u> cost of the surgery – which includes the price of the Stryker product(s) – or pay the full fare for the surgery. (¶¶ 28, 30, 31.)

Thus, Stryker's argument that the complaint fails to allege both injury in fact and causation does not withstand even cursory scrutiny.

**2.   The Complaint Alleges Facts Stating Plaintiff's Eligibility for Restitution from Stryker**

Stryker further argues that because – according to Stryker – the complaint does not allege that Stryker improperly obtained something from Plaintiff that she was entitled to keep, the complaint fails to state a claim for restitutionary relief under section 17200. (Def. MP&A at 9:23-10:8.)

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT**, Case No. CV-08-01609 JSW     9

As discussed immediately above, however, the complaint sufficiently alleges that Plaintiff sustained out-of-pocket expenses for her hip replacement surgery that were higher than they would have been had Stryker not engaged in unlawful practices that artificially raised the prices of its hip and knee implant products. The alleged price increment represents financial harm to Plaintiff that in turn has produced financial benefit to Stryker, all attributable to Stryker's unlawful business practices. This is all that is needed to state a claim for restitution under section 17200.

Therefore, this asserted ground for dismissing the section 17200 claim fails, as well.

### 3. The Complaint Sufficiently Alleges Facts that Would Warrant Injunctive Relief Benefitting Private-Pay Patients, Particularly After the Expiration of Stryker's Non Prosecution Agreement in April 2009

Stryker also argues that the prayer for injunctive relief is barred or otherwise defective.

Stryker's first two grounds for this argument are quickly dispatched. Stryker again contends that the complaint fails to allege actionable conspiracy or misconduct, and that Plaintiff lacks standing to seek injunctive relief because the complaint does not allege injury caused by Stryker's misconduct. (Def. MP&A at 10:13-19.) For the reasons discussed in sections IV.B.1 and 2, above, both argument are without merit.

Styker next argues that because federal authorities are now "extensive[ly] regulat[ing] and monitoring . . . Stryker," the Court should abstain from "granting" injunctive relief. (Def. MP&A at 10:20-12:21.) There are two major flaws in Stryker's argument.

First, as alleged in the complaint, the federal monitoring of Stryker is focused on the effects of Stryker's business practices on the public budget, and is of little if any benefit to private-pay patients like Plaintiff. (Complaint, ¶¶ 27-28.) Additional injunctive relief would not be "pointless," as Stryker asserts, for private-pay patients in California. In addition, Stryker's vague argument that whatever injunctive relief might

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT, Case No. CV-08-01609 JSW      10

eventually be ordered in the present case "might" "conflict and interfere" with federal officials' current oversight of Stryker pursuant to the Non Prosecution Agreement (Def. MP&A at 12:14-16) relies on a purely hypothetical and speculative premise that establishes no reasonable ground for striking the prayer for injunctive relief, much less dismissing the section 17200 claim, at the pleading stage.

More importantly, the Non Prosecution Agreement is set to expire after 18 months (see complaint, Exh. A at 1) – that is, in April 2009, a mere six months after the hearing on this motion. Thus, the basis for Stryker's abstention argument, thin as it already is, will be entirely gone before this litigation is resolved.

In sum, none of Stryker's arguments for dismissing the section 17200 claim stands up to examination. The Court should deny the motion to dismiss this claim.

### C. The Complaint Sufficiently Alleges Plaintiff's Membership in the Class

Finally, Stryker contends that the complaint fails to allege Plaintiffs' membership in the class that she seeks to represent: "she claims neither that she was 'uninsured' nor than she 'had a private health care insurance policy pursuant to which [she] paid [the $3,600 as] a percentage of the total costs of surgical procedures.'" (Def. MP&A at 13:3-6 (brackets in Def. MP&A).)

This argument views only an isolated portion of the complaint, an improper approach. *See Tellabs, supra*, 127 S. Ct. at 2510; *ACA Fin. Guar. Corp., supra*, 512 F.3d at 52. In addition, it fails to heed the requirement that "[w]hen an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995).

First, while paragraph 30 of the complaint does not spell out whether Plaintiff (a) is privately insured or (b) pays the full expenses of her medical care by herself, as Stryker notes, it does allege that she paid in the neighborhood of $3,600 for her hip replacement surgery. (Complaint, ¶ 30.) As a reasonable factual inference, this amount rules out the possibility that she is an uninsured private-pay patient, since the total costs of hip replacement surgery are far more than $3,600.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT, Case No. CV-08-01609 JSW                    11

Beyond paragraph 30, the complaint alleges that Plaintiff is bringing this action "on behalf of herself and other similarly situated Californians" (¶ 29), whom the complaint defines as California residents "who either were uninsured or had a private health care insurance policy pursuant to which they paid a percentage of the total costs of surgical procedures" (¶ 31). It also alleges that "Plaintiff is a member of the class" (¶ 34), and that her "interests are coincident with . . . those of other members of the Class" (¶ 35).

If these pleadings, taken together, leave any ambiguity about whether Plaintiff is one of the private-pay patients who, as the complaint alleges, are left without effective remedy by the federal government's Non Prosecution Agreement with Stryker, that ambiguity must be resolved in favor of Plaintiff. *See, e.g.*, *Jenkins v. McKeithen, supra*, 395 U.S. at 421; *Tellabs, supra*, 127 S. Ct. at 2510; *Columbia Natural Res., supra*, 58 F.3d at 1109.

Therefore, the allegations of the complaint sufficiently plead that Plaintiff is a member of the class that she seeks to represent: Californians with either private health insurance or no health insurance who paid at least a portion of the costs of hip or knee implant surgery, performed during the class period, that involved the use of Stryker implant products. Accordingly, the Court should reject the Stryker attack on the pleadings as to Plaintiff's standing to represent the class.

To the extent that the Court finds any amendments needed to clarify Plaintiff's allegations of standing as a class representative, she should be permitted to amend the complaint. "Amendment is to be liberally granted where from the underlying facts or circumstances, the plaintiff may be able to state a claim." *McCartin v. Norton*, 674 F.2d 1317, 1321 (9th Cir. 1982). Here, the amendment would be simply to insert that Ms. Haggarty has private health insurance with a co-pay requirement.

///

///

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT**, Case No. CV-08-01609 JSW

12

## V. CONCLUSION

For the reasons discussed above, the Court should deny the Stryker Defendants' motion to dismiss. Alternatively, if the Court determines that the complaint's allegations should be pleaded with greater specificity in any respect for purposes of withstanding Defendants' motion, Plaintiff respectfully requests leave to amend.

Dated: July 7, 2008

**COTCHETT, PITRE & McCARTHY**

**COREY, LUZAICH, PLISKA,
 de GHETALDI & NASTARI, LLP**

By  /s/
    FRANK M. PITRE

*Attorneys for Plaintiff Claire C. Haggarty
and the Class*

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT**, Case No. CV-08-01609 JSW         13